IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ARSA DISTRIBUTING, INC.,
    Plaintiff.

       v.

                                    Civil No. 1:22cv1367 (DJN)

SALUD NATURAL MEXICANA SA de CV,
    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court following a bench trial held on February 26, 2024. The instant suit arises from a trademark dispute between Arsa Distributing, Inc. ("Plaintiff") and Salud Natural Mexicana SA de CV ("Defendant") over the rights in the United States to the mark EUCALIN for certain products, including nutritional supplements. This opinion, which contains the Court's findings of fact and conclusions of law, ultimately resolves the dispute in Plaintiff's favor, finding that Plaintiff has priority in the mark and that, at any rate, Defendant has since abandoned any rights that it might have had to the EUCALIN mark.

## I.      BACKGROUND

While the findings of fact will discuss the relevant history at greater length, in brief, from 1999–2008, Defendant manufactured a dietary supplement in Mexico and supplied this supplement to Plaintiff without a written contract. Plaintiff thereafter sold this product in the United States using the unregistered trademark EUCALIN. This arrangement ceased in 2008 when the United States Department of the Treasury's Office of Foreign Asset Control ("OFAC") designated Defendant as a Specially Designated Narcotics Trafficker ("SDNT"), thereby banning Defendant from United States commerce. In 2015, OFAC removed Defendant from the list of

SDNTs.  Although Defendant has been permitted to participate in commerce in the United States since 2015, Defendant has not sold any product under the name EUCALIN in the United States since 2008.

In 2015, after being removed from the SDNT list, Defendant filed an application to register the word mark EUCALIN for use in connection with various pharmaceutical products, including nutritional supplements.  Two years later, Defendant filed a second application for a design mark involving EUCALIN for use in connection with the same.  When the United States Patent and Trademark Office ("USPTO") issued public notices of Defendant's applications, Plaintiff filed notices of opposition to the pending registrations.  The oppositions alleged that Plaintiff had priority in the mark based on Plaintiff's longtime exclusive use of the EUCALIN mark in United States commerce, as well as Defendant's failure to use the EUCALIN word or design mark in the United States since at least 2008.

The Trademark Trial and Appeal Board ("TTAB") rejected Plaintiff's oppositions to Defendant's applications for the mark, because the TTAB found (1) that Defendant had priority in the mark under the 1999–2008 distribution arrangement and (2) that Defendant had not abandoned the mark.  Specifically, the TTAB found that Defendant had not abandoned the EUCALIN mark, (i) because Defendant's nonuse from 2008–2015 was "excusable" given that Defendant had been prohibited by law from engaging in United States commerce and, (ii) because, since 2015, Defendant had shown an intent to resume usage of the mark.  In response to the TTAB's ruling in favor of Defendant, Plaintiff brought this action pursuant to 15 U.S.C. § 1071(b), which allows trademark applicants dissatisfied with TTAB decisions to file an action in district court.

2

On November 6, 2023, Senior Judge T.S. Ellis, III, ruling on the parties' cross motions for summary judgment, overruled the TTAB's decision that Defendant's nonuse had been excusable.[1] *Arsa Distributing, Inc. v. Salud Natural Mexicana SA de CV*, 2023 WL 7301427, at *1 (E.D. Va. Nov. 6, 2023) (ECF No. 50).  The Court, however, left for trial (1) which party had priority in the EUCALIN mark based on the 1999–2008 arrangement between Plaintiff and Defendant in which Defendant manufactured the EUCALIN product and Plaintiff sold the EUCALIN product in the United States; (2) whether Defendant maintained an intent to resume use of the EUCALIN mark in the reasonably foreseeable future during the entire period of Defendant's nonuse of the EUCALIN mark; and (3) whether Plaintiff had failed to use the EUCALIN product in United States commerce from 2018 through 2020 and, assuming Plaintiff had priority in the mark after 2008, whether Plaintiff abandoned the EUCALIN mark as a result.[2] *Id.* at *7–8.  With that trial having now taken place, this case is ripe for final judgment.

## II.     LEGAL CONTEXT

### A.     Applicable Legal Principles

Rights to unregistered trademarks stem from priority of use of a valid protectable mark. *George & Co. v. Imagination Ent. Ltd.*, 575 F.3d 383, 400 (4th Cir. 2009).  As a general matter, priority of use accrues to the entity that first appropriates the mark for commercial gain. *Id.*  This

---

[1]     In January 2024, this matter was reassigned from Senior Judge T.S. Ellis, III to the undersigned.  (ECF No. 59.)

[2]     The Court also left for trial whether "[Plaintiff] has, as [Defendant] claims, used false designation of origin and false representations in connection with the sale of the EUCALIN mark." *Arsa*, 2023 WL 7301427, at *8.  Defendant, however, subsequently consented to dismissal of the counterclaim for lack of standing, and the Court then dismissed Defendant's counterclaim with prejudice.  (ECF Nos. 88, 90.)

test, however, is an "imperfect fit . . . when it comes to" an exclusive manufacturer-distributor relationship, as existed between the parties to this case prior to 2008. *Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 170 (3d Cir. 2017). Looking only at first use would cause trademark ownership rights to inure to the benefit of the distributor simply because the distributor "made the initial sale of goods bearing the mark to the public" even if the distributor did so "at the manufacturer's direction." *Id.* This concern acutely affects these proceedings as the manufacturer and distributor failed to agree in advance on mark ownership.

Because the first-use test proves inadequate in the manufacturer-distributor context, and the parties have not agreed in advance on mark ownership, the Court must resort to a more nuanced test. At the first step, the Court presumes that the foreign manufacturer owns the trademark of its products. *Prod. Source Int'l, LLC v. Nahshin*, 112 F. Supp. 3d 383, 394 & n.13 (E.D. Va. 2015) (Ellis, J.) (collecting cases). However, a distributor may rebut that presumption through reliance on a multi-factor balancing test discussed at greater length below, which "invites courts to consider various indicia of ownership designed to elicit the roles and responsibilities of the parties and expectations of consumers in order to gauge whether, in a given case, the distributor and not the manufacturer operated as the rightful owner of the contested mark." *Covertech Fabricating*, 855 F.3d at 171.

Importantly though, even if an entity once had priority in a mark, it can lose its claim to ownership by abandoning the mark. *Emergency One, Inc. v. Am. FireEagle, Ltd.* (*Emergency One I*), 228 F.3d 531, 535–36 (4th Cir. 2000). As the Fourth Circuit has noted, "'[o]nce abandoned, a mark may be seized immediately and the person . . . doing so may' establish 'priority of use and ownership under the basic rules of trademark priority.'" *Emergency One, Inc. v. Am. Fire Eagle Engine Co.* (*Emergency One II*), 332 F.3d 264, 268 (4th Cir. 2003)

(quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 17:2 at 3 (4th ed. 2003)).

An entity abandons a trademark when the mark's "use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. A court may infer intent not to resume use from a prolonged period of nonuse, with such an inference becoming stronger as the period of nonuse grows longer. *Emergency One I*, 228 F.3d at 540. Three consecutive years of nonuse constitutes *prima facie* evidence of abandonment. 15 U.S.C. § 1127. In other words, three years of nonuse "creates a presumption — a mandatory inference of intent not to resume use." *Emergency One I*, 228 F.3d at 536 (citing *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1025–26 (Fed. Cir. 1989)).

This Court has already ruled that as a matter of law, Defendant's designation as an SDNT does not constitute "excusable nonuse," holding that "unlike in the cases [Defendant] cites, [Defendant]'s withdrawal from the market was not the result of external forces beyond [Defendant]'s control[.]" *Arsa*, 2023 WL 7301427, at *5. Rather, Defendant "brought the SDNT status and associated sanction of being barred from engaging in United States commerce on itself through very serious misconduct, namely involvement in drug trafficking conspiracy or operations." *Id.*

## III.   STANDARD OF REVIEW

Where, as here, a party appeals a decision of the Trademark Trial and Appeal Board pursuant to 15 U.S.C. § 1071(b) and admits new evidence, "the district court reviews the record de novo and acts as the finder of fact" in the first instance. *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014). The Court enjoys "authority independent of the PTO to grant or cancel registrations and to decide any related matters such as infringement and unfair

competition claims." *Id.* Accordingly, this Court reviews the matter *de novo* without deference to the TTAB's findings of fact or conclusions of law.

## IV.   FINDINGS OF FACT

During the trial, only one witness testified: Rossana Arras, Plaintiff's president. The Court found her to be credible. Based on the evidence presented at trial, the parties' stipulations, and the factual record before the TTAB, the Court makes the following findings of fact.[3]

### A.   *Use of the EUCALIN Mark in the United States Before October 2008*

1. Defendant, a Mexican company, began selling dietary supplements called EUCALIN in Mexico in 1997. (ECF No. 58 (Joint Statement of Undisputed Facts ("JSUF")) ¶ 1.)

2. Plaintiff, a Texas corporation, began selling dietary supplement products called EUCALIN in the United States in 1999. (*Id.* ¶ 5.) From 1999 to 2008, Plaintiff purchased these supplements from Defendant in Mexico and imported them into the United States. (*Id.* ¶ 6.)

3. Plaintiff did not have the original idea for the EUCALIN mark or the artwork associated with the packaging for the product. (*Id.* ¶ 3.) Rather, Defendant authorized Plaintiff to use the mark and artwork to sell the product in the United States. (*Id.*)

4. No written distribution agreement ever existed between the parties regarding the ownership of trademark rights in the United States. (*Id.* ¶ 4.)

5. Nor did the parties have any verbal distribution agreement regarding ownership of trademark rights. (PTX018 (Def.'s Resp. to Pl.'s Interrogs. Nos. 11 and 12); PTX001 ("Def. 30(b)(6) Dep.") 26:1–16; *see also* Def. 30(b)(6) Dep. at 26:14–16 ("**Q.** Do you know what the terms of the agreement would have been? **A.** I don't know that.").)

6. No entity other than Plaintiff has ever sold EUCALIN products in the United States. (JSUF ¶ 26; PTX025 (Declaration of Rossana Arras ("R. Arras Decl.")) ¶ 14.)

7. While Defendant may have contributed to the cost of advertising in the United States, Plaintiff determined where and how to advertise and also contributed to the cost of such advertising. (PTX031 (TTAB Trial Testimony of Sergio Arras ("S. Arras Testimony")) ¶¶ 9, 13; ECF No. 37-A ¶ 5; DTX13 (Emails regarding advertising); Def. 30(b)(6) Dep. at 26:21–23.)

---

[3]   Citations to specific portions of the record should be understood as citations to representative materials only and not an exhaustive catalog of all support for each respective finding or conclusion.

8.  Defendant never instructed Plaintiff who to solicit as customers, never spoke directly with any of Plaintiff's customers, never visited Plaintiff's customers, and never interacted directly with Plaintiff's customers. (S. Arras Testimony ¶ 11.)

9.  Instead, Plaintiff solicited its own customers and maintained those relationships. (*Id.*)

10. Defendant did not provide any rules or restrictions regarding Plaintiff's sales or promotion of product purchased from Defendant, did not set forth any minimum amount of product Plaintiff had to sell and did not establish a marketing budget. (*Id.* ¶ 13.)

11. Defendant did not impose any rules or restrictions on Plaintiff's use of the EUCALIN mark. (*Id.*)

12. Since first selling the EUCALIN products in the United States, Plaintiff invested substantial time and money, resulting in increased sales. (S. Arras Testimony ¶¶ 9, 10.)

13. In the event a customer did not purchase all of the product as anticipated or returned unsold product to Plaintiff, Defendant did not take back the product; instead, Plaintiff was solely responsible for finding a new purchaser. (S. Arras Testimony ¶ 14.)

14. The packaging for the EUCALIN products until 2008 was co-branded and included logos for both Defendant and Plaintiff. (JSUF ¶ 7.)

15. As Plaintiff's president credibly testified during trial, Plaintiff had the responsibility for the quality of the product sold in the United States. (ECF No. 108 ("Trial Tr.") 12:24–13:3.) All boxes of the product had listed on them Plaintiff's name and contact information, including its mailing address, phone number, and internet address. (JSUF ¶ 9.) Meanwhile, the boxes provided only Defendant's mailing address, indicating to customers that they should contact Plaintiff should they have any issues with the product. (*Id.* ¶ 8.) Indeed, if a store or distributor had a problem with the product, they would contact Plaintiff, rather than Defendant. (Trial Tr. 11:6–9.) Plaintiff would always deal with those complaints themselves rather than referring the concerns to Defendant. (*Id.* at 11:15–19.)

16. Plaintiff also handled any regulatory issues that arose in the United States. As Plaintiff's president credibly testified, at some point between 2002 and 2007, the Food and Drug Administration ("FDA") had concerns about the product's labeling and, when it did, it contacted Plaintiff and not Defendant. (Trial Tr. 13:7–14.) Plaintiff sent products to the FDA's labs in order to resolve those concerns and ensure the proper labeling of the products. (*Id.*)

17. Between 2002 and 2008, Defendant filed three trademark applications relating to EUCALIN: one for the word mark and two for design marks. (JSUF ¶ 35; ECF No. 21-K.) Defendant filed all three applications based on its intent to use the marks pursuant to 15 U.S.C. § 1051(b) (Lanham Act § 1(b)), rather than any claimed actual use or any foreign rights in the marks under 15 U.S.C. § 1126(e). (JSUF ¶ 36; ECF No. 21-K.) Defendant abandoned all three applications. (ECF No. 21-K, 21-L, 21-M.)

18. Plaintiff filed trademark applications for EUCALIN in 2008 and 2018 based on its use of the mark in commerce since 1999, reflecting its understanding that it was always the owner of the trademark in the United States. (PTX006; PTX008.)

19.    When the Department of the Treasury banned Defendant from supplying EUCALIN product by naming Defendant a narcotics trafficker in 2008, Plaintiff continued selling EUCALIN-branded products without significant interruption by finding a new supplier. (Trial Tr. 7:9–13.)

### B.    Defendant's Ban from Doing Business in the United States

20.    In October of 2008, OFAC named Defendant an SDNT pursuant to the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1901 *et seq.*, and banned Defendant from conducting business in the United States. (JSUF ¶ 10.)

21.    OFAC designated Defendant as an SDNT, because it determined that Defendant was part of the financial and supply network for the Amezcua Contreras Organization, a Mexican drug cartel. (*Id.* ¶ 11.) OFAC made this designation to "degrade and dismantle" the Amezcua Contreras Organization's "network of associates producing methamphetamines for distribution in the United States." (*Id.* ¶ 12.)

22.    OFAC produced a chart depicting key members of the Amezcua Contreras Organization showing Defendant (and its owners) as part of that organization's pseudoephedrine diversion regime. (*Id.* ¶ 13.)

23.    OFAC's ban was not for a specified time; rather, it could have lasted indefinitely. *See* 31 C.F.R. § 598.201 ("The application of sanctions on any specially designated narcotics trafficker will remain in effect until revoked by the President pursuant to section 804(h)(2) of the Foreign Narcotics Kingpin Designation Act, waived by the President pursuant to section 804(g)(1) of that Act, or revoked by the Secretary of the Treasury pursuant to section 805(e)(1)(A) of that Act.").

24.    While OFAC's ban was in effect, Defendant did not know how long the ban would last or, by extension, whether it would ever again be permitted to do business in the United States. (Def. 30(b)(6) Dep. at 15:14–21.)

25.    On May 22, 2015, nearly eight years after OFAC's ban took effect, Defendant was removed from the list of Specially Designated Nationals and Blocked Persons. (JSUF ¶ 24.)

26.    The letter informing Defendant's attorney that the Department of the Treasury was removing Defendant from the SDNT list stated that Defendant "no longer [met] the criteria for designation." (*Id.* ¶ 25.)

27.    Defendant has not offered any credible evidence, testimonial or otherwise, that its SDNT designation was unwarranted by its conduct or was removed because it was somehow mistaken or defective.

28.    During the ban, Defendant did not supply Plaintiff with EUCALIN-branded product or otherwise export, sell, distribute, or advertise EUCALIN-branded product into the United States. (Def. 30(b)(6) Dep. at 22:9–11; JSUF ¶ 43.)

### C.    *Use of the EUCALIN Mark Following October 2008*

29.    On October 21, 2008 — nineteen days after OFAC instituted its ban — Defendant filed an intent-to-use trademark application (Serial No. 77/597,548 (the "'548 Application")) for a EUCALIN logo.  (JSUF ¶ 39; ECF No. 21-M.)

30.    In April 2009 and May 2009, Defendant filed responses to USPTO Office Actions rejecting the '548 Application.  (JSUF ¶ 40.)  The responses were successful, and the USPTO issued a Notice of Allowance on September 22, 2009, for the '548 Application.  (*Id.* ¶ 41.)

31.    However, Defendant did not file any statement of use or extension of time, and the USPTO deemed the '548 Application abandoned.  (*Id.* ¶ 42.)

32.    On October 6, 2015, Defendant filed an application for the word mark EUCALIN for use in connection with various pharmaceutical products including nutritional supplements.  (ECF No. 21-W.)  On October 19, 2017, Defendant filed a second application for a design mark involving EUCALIN for use in connection with various products including nutritional supplements.  (ECF No. 21-X.)

33.    Plaintiff filed oppositions to Defendant's pending applications for the EUCALIN word and design marks.  The oppositions accurately alleged that Defendant's applied-for marks were likely to cause confusion with Plaintiff's EUCALIN mark because of the near identity of the marks and the identical or highly related nature of the associated goods.  (ECF Nos. 21-R ¶ 21, 21-S ¶ 45.)  The TTAB consolidated the two oppositions into a single case on November 5, 2018.  (ECF No. 21-T.)  Defendant's oppositions give rise to the instant 15 U.S.C. § 1071(b) action.

34.    Since OFAC lifted its ban in May 2015, Defendant has not exported or sold any EUCALIN-branded products in the United States.  (JSUF ¶ 28.)

35.    No EUCALIN-branded products that have any connection to Defendant have moved in United States commerce since October 2008.  (JSUF ¶ 29.)

36.    Defendant has no specific plans for how it would distribute EUCALIN-branded products in the United States.  (*Id.* ¶ 30.)

37.    Defendant does not know where or how it would distribute EUCALIN products in the United States.  (*Id.* ¶ 34.)

38.    Defendant has not tried to sell EUCALIN-branded product in the United States since 2008 and does not have any specific plans for making sales in the United States.  (*Id.* ¶ 43.)

39.    Defendant owns a United States trademark registration for the mark ACTIKROLL that it registered on May 23, 2017, but it has not sold that product in the United States.  (Def. 30(b)(6) Dep. 11:12–14 ("**Q.** Currently, are there any products that Defendant is distributing in the United States?  **A.** No."); PTX013 (Registration and Trademark Status and Document Retrieval ("TSDR") report for ACTIKROLL).)

40. Defendant owns a United States trademark registration for the mark CALTRON that it registered on August 22, 2017, but it has not sold that product in the United States. (Def. 30(b)(6) Dep. 11:12–14 ("**Q.** Currently, are there *any products* that Salud is distributing in the United States? **A.** No."); PTX014 (TSDR report for CALTRON).)

41. On October 10, 2022, Defendant executed an Agreement for the Transfer of Trademarks from Defendant to AF Operadora de Negocios, S.A. de C.V. (PTX041.) This Agreement transferred whatever rights Defendant may have had in the EUCALIN and certain other marks, including whatever rights Defendant may have had to those marks in United States commerce. (*Id.*)

### D. *Plaintiff's Ongoing Use After October 2008*

42. In October 2008, soon after OFAC banned Defendant from conducting business in the United States, Plaintiff filed a trademark application (Serial No. 77/598,565 (the "'565 Application")) for the mark EUCALIN for dietary and nutritional supplements. (JSUF ¶ 14.)

43. The USPTO allowed Plaintiff's '565 Application and published it for opposition on November 16, 2010. (*Id.* ¶ 15.)

44. Plaintiff's '565 Application matured into the trademark EUCALIN, Registration No. 3,912,708, on February 1, 2011. (*Id.* ¶ 16.)

45. The USPTO cancelled Registration No. 3,912,708 on September 8, 2017, because Plaintiff failed to timely file an affidavit pursuant to 15 U.S.C. § 1058 (Lanham Act § 8). (*Id.* ¶ 18.)

46. Plaintiff filed a trademark application for the mark EUCALIN on January 31, 2018, which the USPTO assigned Serial No. 87/778,409 (the "'409 Application"). (*Id.* ¶ 19.)

47. Plaintiff filed both its '565 application and its '409 application as use-based, based on use dating back to November 1999. (ECF Nos. 21-F, 21-H.)

48. Plaintiff's '409 Application for the mark EUCALIN is currently pending at the USPTO, but it has been suspended pending the outcome of this matter. (JSUF ¶ 20.)

49. Plaintiff ceased distribution of the EUCALIN-branded products that it had obtained from Defendant in October 2008 when it learned that OFAC had named Defendant an SDNT. (*Id.* ¶ 21.)

50. Since 2009, Plaintiff has obtained its supply of EUCALIN-branded products from a source other than Defendant. (*Id.* ¶ 22.)

51. Since 2009, Plaintiff has continually and exclusively sold EUCALIN-branded products in 17 states, including Arizona, California, Colorado, Delaware, Florida, Georgia, Illinois, Maryland, New Mexico, North Carolina, Oklahoma, Oregon, Maryland, New York, Tennessee, Texas, and Virginia. (R. Arras Decl. ¶ 13.)

52. As Plaintiff's president credibly testified during trial, during the last fifteen years, Plaintiff has continuously sold EUCALIN-branded products in the United States. (Trial Tr. 7:9–16.)

## V.    CONCLUSIONS OF LAW

### A.    *Plaintiff has priority in the EUCALIN mark.*

As discussed above, in determining ownership of United States trademark rights between a United States company that imports product and re-sells it in United States commerce and a foreign manufacturer where there is no distribution agreement that reflects ownership rights, courts have determined who ultimately owns the rights by coupling a presumption in favor of the manufacturer with a multi-factor analysis. *See, e.g., Covertech Fabricating*, 855 F.3d at 171 (applying such an analysis).  While the Fourth Circuit has not squarely addressed this issue, other courts in this District have applied a non-exclusive, four-part analysis analyzing at least the following factors:  (1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; and (4) with which party the public identified the product and to whom purchasers made complaints. *Nahshin*, 112 F. Supp. 3d at 396–97.[4]  Ultimately, the purpose of such a balancing test is to assess "various indicia of ownership designed to elicit the roles and responsibilities of the parties and the expectations of consumers in order to gauge whether, in a given case, the distributor and not the manufacturer operated as the rightful owner of the contested mark." *Covertech Fabricating*, 855 F.3d at 171.

---

[4]      Other courts, including the Third Circuit, have relied on a six-factor balancing test, which examines (1) "[w]hich party invented or created the mark"; (2) "[w]hich party first affixed the mark to goods sold"; (3) "[w]hich party's name appeared on packaging and promotional materials in conjunction with the mark"; (4) "[w]hich party exercised control over the nature and quality of goods on which the mark appeared"; (5) "[t]o which party did customers look as standing behind the goods, e.g., which party received complaints for defects and made appropriate replacement or refund"; and (6) "[w]hich party paid for advertising and promotion of the trademarked product." *Covertech Fabricating*, 855 F.3d at 171.  While the Third Circuit's six factors differ from this District's four, the information considered remains largely the same. Indeed, applying the six-factor test here would yield the same conclusion and would involve consideration of identical facts from the record.

While a presumption exists in favor of Defendant, applying this four-factor balancing test while considering the purpose of the inquiry leads to the conclusion that Plaintiff had priority in the mark. The first factor — which party invented and first affixed the mark onto the product — favors Defendant. (JSUF ¶¶ 1–3.) The second factor — which party's name appeared with the trademark — is neutral. Both parties' names, physical addresses, and logos appeared on the EUCALIN product, although Plaintiff additionally provided its website and phone number on the packaging. (*Id.* ¶¶ 7–9.) However, the third and fourth factors strongly favor Plaintiff, and those factors resolve this question.

The third factor — which party maintained the quality and uniformity of the product — favors Plaintiff. Although Defendant made and packaged the supplement, which would typically suggest that Defendant bore the responsibility for the product's quality, here the record indicates that Plaintiff took on the responsibility of standing behind the product's quality. As an initial matter, the packaging, which bore both parties' names, provided information such that customers could readily contact only Plaintiff. It is far more likely that a consumer who experienced issues with the EUCALIN product would have reached out to Plaintiff via its website or phone number, both of which were provided on the box, rather than attempting to mail a physical letter to Defendant's address in Mexico. Indeed, as Plaintiff's president credibly testified during trial, if a store or distributor had a problem with the product, they would contact Plaintiff, rather than Defendant. (Trial Tr. 11:6–9.) Plaintiff would always deal with those complaints itself rather than referring customer concerns to Defendant. (*Id.* at 11:15–19.) As a result, customers would understandably and justifiably see Plaintiff as bearing responsibility for the product's quality.

Additionally, when regulatory issues with the product arose, Plaintiff addressed these issues, not Defendant. At some point between 2002 and 2007, the FDA had concerns about the

product labeling and, when it did, it contacted Plaintiff and not Defendant. (Trial Tr. 13:7–14.)
Plaintiff then sent products to the FDA's labs to resolve those concerns and ensure the proper
labeling of the products. (*Id.*) Further, the record evidence reflects that in the event a customer
did not purchase all of the product as anticipated, or returned unsold product, Defendant did not
take back the product; instead, Plaintiff was responsible for handling returns. (S. Arras
Testimony ¶ 14.) Finally, when OFAC barred Defendant from doing business in the United
States, Plaintiff was solely responsible for finding a new manufacturer who could produce the
product in a high-quality and uniform manner. (Trial Tr. 7:9–11.)

    The fourth factor — with which party the public identified the product and to whom
purchasers made complaints — also favors Plaintiff. Many of the considerations for this factor
overlap with that of the previous factor. Plaintiff was the entity responsible for fielding and
addressing concerns and, as a result, consumers, stores and government agencies in the United
States understandably saw Plaintiff as the entity standing behind the product. Moreover,
Defendant never told Plaintiff who to solicit as customers, never spoke directly with any of
Plaintiff's customers, never visited Plaintiff's customers, and never interacted directly with
Plaintiff's customers. (S. Arras Testimony ¶¶ 9–11.) Plaintiff also led advertising efforts.
Defendant did not set out any rules or restrictions regarding Plaintiff's sales or promotion of
product purchased from Defendant, did not set forth any minimum amount of product that
Plaintiff had to sell, and did not establish a marketing budget. (*Id.* ¶ 13.) For all purposes,
Plaintiff was the face of the company to the United States public and Plaintiff determined how
and where people were exposed to the EUCALIN product.

    In this case, the behavior of the parties also usefully indicates how a written agreement,
had there been one, might have allocated the trademark rights between the parties. This too

counsels in favor of Plaintiff having priority:  both parties' behavior suggests that they each believed that Plaintiff's use of the mark did not inure to Defendant's benefit.  When Defendant filed United States trademark applications pre-2008, it always filed them on a "intent-to-use" basis, rather than on a use in commerce basis, and it never perfected these applications by submitting evidence that it had itself used the mark by selling products through Plaintiff. (PTX010; PTX011; PTX012; PTX044.)  On the other hand, when Plaintiff filed its trademark applications, it filed them based on its use of the mark in commerce dating back to 1999, reflecting its understanding that its previous use of the mark in the United States had inured to its benefit.  (PTX006; PTX008.)

Further, Defendant knew, or should have known, of Plaintiff's continued use of the EUCALIN mark by virtue of Plaintiff's published trademark application and registration. (PTX006; ECF No. 21-F; *see* 15 U.S.C. § 1072 ("Registration of a mark on the principal register provided by this chapter . . . shall be constructive notice of the registrant's claim of ownership thereof.").  Despite having at least constructive knowledge of Plaintiff's ownership of the EUCALIN mark in the United States since 2011, Defendant never objected to Plaintiff's use of the EUCALIN mark and did not seek to cancel or challenge Plaintiff's trademark registration until July 2016, over a year after it could do business in the United States again.  (PTX006; Def. 30(b)(6) Dep. 38:8–13, 43:4–6; PTX019 (Def.'s Resp. to Pl.'s Document Request No. 8) (no documents provided)).

Moreover, the behavior of the parties after the ban suggests that Plaintiff had significant control and ownership over the EUCALIN product in the United States.  Far from being adrift after OFAC banned Defendant from commerce in the United States, Plaintiff readily found a new manufacturer of the product and continued sale of the EUCALIN product in the United

States without significant interruption.  (PTX032 ¶¶ 14, 20; Trial Tr. 7:9–11.)  The possibility of

this transition indicates Plaintiff's existing ownership over the sale of the product in the United

States.  Indeed, Plaintiff already handled the storage and distribution of the product, fielded

customer inquiries and concerns, addressed regulatory hurdles and navigated consumer relations.

It comes as no surprise that losing its manufacturer, while a misfortune, did not hamstring

Plaintiff's robust operations.

In sum, although there exists a presumption of ownership in favor of the manufacturer,

the evidence in the record suffices to rebut that presumption and instead leads to the conclusion

that Plaintiff, not Defendant, had priority in the EUCALIN mark in the United States.

    B.     ***Any rights Defendant may have had in the EUCALIN mark have long since been abandoned.***

Further, to the extent that Defendant had any rights in the EUCALIN mark, Plaintiff has

met its burden of proving by a preponderance of the evidence that Defendant has since

abandoned those rights.

The parties do not dispute that Defendant has not used the EUCALIN mark in

commerce since 2008, which triggers the presumption of abandonment.  The question

becomes whether Defendant had the requisite intent to resume use of the mark in the

reasonably foreseeable future during its prolonged period of nonuse.[5]  *See* 15 U.S.C. § 1127

(stating that abandonment occurs when "use has been discontinued with intent not to resume

---

[5]     The statute refers to "intent not to resume use," 15 U.S.C. § 1127, while the Fourth Circuit often refers to the standard as "no intent to resume use."  *See, e.g., George & Co. LLC v. Imagination Ent.* Ltd., 575 F.3d 383, 401 (4th Cir. 2009) ("Our case law requires a showing of . . . no intent to resume use[.]"); *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 538 (4th Cir. 2000) ("[D]iscontinued use of a mark results in abandonment unless the owner of the mark has an intent to resume use in the reasonably foreseeable future.").  This opinion uses the two terms interchangeably and, to the extent there is any difference between the two, finds both that Defendant had an intent not to resume use and had no intent to resume use of the mark.

use"). The record here stands bereft of the sorts of facts that appellate courts have found evidence of an intent to resume use.[6] Not only has Defendant not sold or tried to sell EUCALIN in the United States since 2008, Defendant has no specific plans for how or where it would distribute EUCALIN-branded products in the United States. (JSUF ¶ 30.) At no point over the past fifteen years has Defendant created any marketing plans, sales projections, or business plans that would reflect an intent to use the mark in the United States. Nor has Defendant spent any money promoting or advertising Defendant's EUCALIN mark in the United States or engaged in any promotional activities for EUCALIN in the United States since 2008. (PTX017 (Def.'s Resp. to Pl.'s Interrog. No. 8).) In sum, the facts in the record provide strong support for the conclusion that Defendant has lacked an intent to resume use of the mark during its period of nonuse.

Moreover, Defendant transferred any rights that it may have had in the EUCALIN mark in the United States to a third-party. (PTX041 (Assignment Agreement).) In 2022, it executed an agreement with AF Operadora de Negocios, S.A. de C.V. assigning it the rights to the EUCALIN brand (along with a host of other brands) "without limitation of territory," including the right to "request the corresponding registrations abroad." (*Id.*) Even setting aside whether

---

[6]     For instance, in *Emergency One I*, the Fourth Circuit found evidence of intent to resume use based on (1) continuous promotional use of the mark on hats, T-shirts, tote bags, and souvenir nameplates; (2) testimony from executives that they "actively considered using" the mark on firetrucks during the three-year nonuse period; and (3) a business plan formulated during the statutory period of nonuse that identified the disputed mark as one of four potential brand names for a new line of firetrucks and corroborated the executives' testimony.  228 F.3d at 537.  Meanwhile, in *Crash Dummy Movie*, the Federal Circuit found that the owner met its burden by establishing that it (1) entered into discussions with a retailer regarding a potential deal involving toys with the disputed marks; (2) contemplated manufacturing toys under the marks at the time of those discussions; and (3) recorded the trademark assignment with the USPTO that same year.  601 F.3d at 1391.

the assignment itself constitutes abandonment,[7] the assignment undermines any notion that Defendant has been or is eagerly awaiting the opportunity to resume use of the mark.

Defendant's arguments that it has maintained an intent to resume use of the mark fail to persuade. First, Defendant claimed that it showed an ongoing intent to resume use when it filed a new trademark application, Serial No. 86/779,422 (the "'422 Application"), in 2015 to register the EUCALIN mark in the United States after the OFAC lifted the ban. (Def.'s Tr. Br. at 16–17; PTX023.) But Defendant's history of filing trademark applications and then failing to use the marks in commerce undermines Defendant's attempt to use the '422 Application as evidence of intent to use the EUCALIN mark. (ECF No. 21-N (USPTO record showing Salud's registration of the ACTIKROLL mark); ECF No. 37-B (USPTO record showing Salud's registration of the CALTRON mark); ECF No. 21-A ("Tirado-Diaz Dep.") at 11:12–14 ("**Q.** Currently are there any products that Salud is distributing in the United States? **A.** No.").) Even if the '422 Application were indicative of Defendant's intent to use the mark in October 2015 when it was filed or shortly before that date (considering that it would have taken at least some time to decide to prepare the application and follow through on that decision), Defendant's decision to file a trademark application in 2015 cannot support the conclusion that Defendant maintained an intent to use the mark in the foreseeable future throughout its fifteen-year period of nonuse.

Second, Defendant argues that it showed an ongoing intent to resume use, because Defendant sued Plaintiff's Mexican suppliers of EUCALIN-branded products in 2016, and "[Plaintiff] is named in both documents as a Distributor of the [alleged] infringing products."

---

[7]   *See, e.g., Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 127 (4th Cir. 2019) ("Naked licensing occurs when the licensor fails to exercise adequate quality control over the licensee [and] [i]n such a case, the court may find that the trademark has been abandoned.") (internal quotation marks omitted).

(Def.'s Tr. Br. at 17; PTX017 (Def.'s Resp. to Pl.'s Interrog. No. 1).)  Here again, Defendant's decision to file a complaint in 2016 says little about its intentions throughout its prolonged period of nonuse.  Moreover, Defendant's failure to file a lawsuit earlier than 2016 undermines its claims that it has consistently maintained an intent to resume use of the EUCALIN mark in the United States.  Defendant has provided no reason why the OFAC ban would have prevented it from filing a lawsuit in Mexico against Mexican companies manufacturing products for Plaintiff at any point during the time the Kingpin Act sanctions were in place.  Nevertheless, Defendant took no action until 2016.

In addition, the filing of a trademark infringement action in Mexico against Plaintiff's suppliers in 2016 fails to show Defendant had an intent to resume use of EUCALIN in United States commerce in the reasonably foreseeable future.  It shows only that Defendant sought to protect its Mexican trademark rights.  (JSUF ¶¶ 31, 33; PTX017 (Def.'s Resp. to Pl.'s Interrog. No. 1); Def.'s 30(b)(6) Dep. 38:8–13, 43:4–6; PTX019 (Def.'s Resp. to Pl.'s Document Request No. 8) (no documents provided).)  Indeed, even a suit alleging infringement in the United States would not have constituted use of the mark or been sufficient evidence of intent to use.  *See* 2 McCarthy at § 17:11 ("Ordinarily, a lawsuit against an infringing user is not a sufficient excuse for failure to use a mark.  A lawsuit does not substitute for the required use of the mark in the marketplace."); *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 638 F. Supp. 3d 644, 662 (E.D. Va. 2022), *appeal docketed*, No. 22-2236 (4th Cir. Dec. 1, 2022) ("The filing of a lawsuit, however, is only an indication that the plaintiff intends to protect its rights to the trademark, not that the plaintiff intends to *resume use of the mark.*") (emphasis in original).

Third, Defendant claims that it showed an ongoing intent to resume use, because it filed a Petition for Cancellation of Plaintiff's EUCALIN trademark registration (Reg. No. 3,912,708) on

July 14, 2016, after the USPTO cited that registration in a February 2, 2016 office action as a basis for refusing registration of Defendant's application for the mark EUCALIN.  (JSUF ¶ 17; Def.'s Tr. Br. at 17; PTX017 (Def.'s Resp. to Pl.'s Interrog. No. 1); PTX023.)  Here, just as before, Defendant's 2016 actions hardly constitute proof of its intentions over the preceding eight years.

Fourth, Defendant points to its attempts to have OFAC remove it from the SDNT List.  (Def.'s Tr. Br. at 18.)  At trial, Defendant produced part of two letters indicating that Defendant sought reconsideration of the OFAC designation on May 5, 2010 and November 12, 2009.  (DX24 at SNM000364, SNM000366 (Letters to OFAC from Counsel for Defendant).)[8]  Even if Defendant's letters to OFAC showed that Defendant intended to use the mark in 2009 and 2010, those letters would still say little about Defendant's intent to use the mark during the rest of its period of nonuse.  Indeed, the letters do not even suffice to show an intent to use the mark in 2009 or 2010.  Notwithstanding Defendant's officers' self-serving declarations, the record contains no evidence that Defendant sought to have the ban lifted to sell EUCALIN products in the United States.  Defendant makes and sells other products, and it certainly had many reasons to seek removal from the SDNT list other than to sell EUCALIN in the United States.  (Tirado-Diaz Dep. at 10:20–11:1.)  Defendant's request to be removed from the list of narcotics traffickers and allowed into U.S. markets provides little information about Defendant's intent to resume selling a specific product in the reasonably foreseeable future.  The evidence that

---

[8]     In addition to the partial excerpts from the May 2010 and November 2009 letters, Defendant provides a December 2008 fax, presumably to show its efforts to be removed from the OFAC list.  (DX24 at SNM000353–358.)  This fax is irrelevant, because it does not concern Salud Natural, but rather Producto Collins and Telesforo Baltazar Tirado Escamilla.  Even if the December 2008 fax concerned Defendant, that would not change the Court's conclusion that minimal and sporadic efforts to regain the right to do business in the U.S. in general are not probative of an intent to use the EUCALIN mark years before and after it made those efforts.

Defendant provides as to its limited efforts to be de-designated as an SDNT cannot reasonably support the conclusion that Defendant maintained an intent to resume use of EUCALIN in the United States throughout its period of nonuse.

Finally, the self-serving declarations from Defendant's officers fail to persuade. They consist merely of the claim that Defendant lacked the intent to abandon the mark without providing any detail, specificity, or corroborating information that would allow this Court to find their statements credible. (DTX2 ¶ 6 (Declaration of Luis Diaz); ECF 24-2 ¶ 6 (Declaration of Maria Teresa Tirado-Diaz.) Their statements are no more than "vague, subjective" statements of "intent to resume use of a mark at some unspecified future date," which the Fourth Circuit has found insufficient to constitute evidence of intent to resume use in the reasonably foreseeable future. *Crash Dummy Movie*, 601 F.3d at 1391; *see also Imperial Tobacco Ltd. v. Philip Morris Inc.*, 899 F.2d 1575, 1581 (Fed. Cir. 1990) ("In every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest . . . An averment of no intent to abandon is little more than a denial in a pleading.").

Ultimately, the Court concludes that Plaintiff has shown by preponderance of the evidence that Defendant, who has not been involved in any way in the sales of EUCALIN products in the United States since 2008, did not have an intent to resume using the mark in the reasonably foreseeable future during its period of nonuse. The Court has already held that Defendant's SDNT status does not constitute excusable nonuse and Defendant has offered no other reason their nonuse ought to be excused. Accordingly, the Court concludes that Defendant abandoned any rights that it may have had to the EUCALIN mark.

    *C.*    ***Plaintiff did not abandon its rights to the EUCALIN mark through nonuse.***

In its summary judgment briefing, Defendant contended for the first time that Plaintiff abandoned its EUCALIN mark due to nonuse between 2018 and 2020. However, Plaintiff's

president testified credibly at trial that Plaintiff has continuously sold the product in the United States since 2009. (Trial Tr. 7:9–16.) The changes in the purchase records that Defendant provided in support of its position stem not from Plaintiff's nonuse of the trademark, but rather from a change in Plaintiff's business practices. Rather than purchasing syrup already labeled as EUCALIN, Plaintiff's president credibly testified that the company began purchasing the syrup and then labeled the product itself, resulting in the change in their recordkeeping. (*Id.* at 7:17–9:14.) The Court finds that Plaintiff did not abandon the EUCALIN mark. Accordingly, Plaintiff retains the priority in the mark that it established during the 1999–2008 distribution arrangement, or at the very least, from its use of the mark since Defendant abandoned its own rights. Because Plaintiff has priority in the EUCALIN mark, Defendant's applications for the EUCALIN mark are improper and the USPTO should not register them. 15 U.S.C. § 1052(d) (prohibiting registration of a mark "previously used in the United States by another and not abandoned").

## VI.   CONCLUSION

For the aforementioned reasons, the Court will enter judgment for Plaintiff.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Alexandria, Virginia
Dated: April 16, 2024